IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

UNITED STATES OF AMERICA                                                    PLAINTIFF

v.                              No. 5:12-CR-50035-001, 13-50004-001

BRANDON LYNN BARBER                                                     DEFENDANT

## ORDER ON RESTITUTION

Defendant Brandon Lynn Barber was originally indicted in case 12-50035 on July 11, 2012 and in case 13-50004 on January 16, 2013.  Barber ultimately pleaded guilty, pursuant to a written plea agreement, to two counts of a third superseding indictment in 12-50035 (one count of conspiracy to commit bankruptcy fraud and one count of money laundering) and one count of a superseding indictment filed in 13-50004 (conspiracy to commit bank fraud).  After preparation and review of a pre-sentence investigation report ("PSR"), Barber was sentenced on October 28, 2014. On the day of sentencing, the Court reserved ruling on the issue of restitution pursuant to 18 U.S.C. § 3664(d)(5).  The Court set a briefing schedule and set the matter for a hearing on restitution, which was held on January 5, 2014.  The Court has considered the parties' briefs (Docs. 256 and 257) as well as the testimony and evidence presented at the hearing.  Based on the reasoning set forth below, the Court finds that the judgment in this case should be amended to include imposition of a restitution obligation in the amount of $450,000 payable to First Federal Bank.

Restitution is mandatory in this case as an offense against property in which a victim or victims have suffered a pecuniary loss.  18 U.S.C. § 3663A (the Mandatory Victims Restitution Act ("MVRA")).  "Restitution is compensatory, not punitive.  In a fraud case, it is limited to the actual loss *directly caused* by the defendant's criminal conduct in the course of the scheme alleged in the

-1-

indictment." *United States v. Chaika*, 695 F.3d 741, 748 (8th Cir. 2012) (quotation omitted).

"Congress has authorized restitution only for the 'amount of the loss sustained by a victim as a result

of the offense.'" *Paroline v. United States*, 134 S.Ct. 1710, 1731 (2014) (Roberts, C.J. dissenting)

(quoting 18 U.S.C. § 3664(e)). The Supreme Court has "interpreted virtually identical language, in

the predecessor statute to section 3664, to require restitution to be tied to he loss caused *by the*

*offense of conviction*." *Id.* (quotation omitted). "That is, restitution may not be imposed for losses

caused by any other crime or any other defendant." *Id.* However, "[t]he court shall also order, if

agreed to by the parties in a plea agreement, restitution to persons other than the victim of the

offense." 18 U.S.C. § 3663A(a)(3). In this case, the Government seeks restitution of $550,000

resulting from an offense to which Barber pleaded guilty—the conspiracy to commit bank fraud

count of 13-50004. The Government also seeks restitution in the total amount of $15,648,996.39

for losses that it argues resulted from bank-fraud counts in 12-50035 to which Barber did not plead

guilty.

In his plea agreement, Barber agreed "to pay restitution for the full amount of the victims'

losses to all victims of the offense(s) to which defendant is pleading guilty *and to all victims of any*

*offense(s) dismissed as a result of this plea*."[1] (Doc. 134, ¶ 17). For purposes of the applicable

---

[1] The Court does not believe this is the type of agreement contemplated by the drafters of 18 U.S.C. § 3663A(a)(3), as such a vague agreement puts the Court in the tenuous of position of having to order restitution to unidentified persons or entities on the basis of conduct that has not been admitted to or proven, and it leaves the defendant having to prepare to defend against all charges at the restitution stage without the benefit of the traditional discovery process. Rather, the Court believes section (a)(3) was likely included to enable parties to a criminal case to provide restitution to specifically identified individuals or entities (i.e. in the case of a crime with a minor victim, agreeing to pay restitution to a parent or guardian who might not otherwise qualify as a victim under the MVRA). Nevertheless, the Court will consider restitution as to the dismissed counts, as the agreement appears to comply with the letter, if not the spirit, of the law.

restitution statute, "the term 'victim' means a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered . . ." 18 U.S.C. § 3663A(a)(2). The Court finds that application of this definition to the terms of the plea agreement in this case is appropriate. For the Court to order restitution based on an offense of conviction—where the fact of the commission of an offense has been established—the Court must only determine whether any person or entity seeking restitution (or on whose behalf the Government seeks restitution) was harmed as a direct and proximate result of the offense conduct. For conduct outside an offense of conviction, the Government must also necessarily make a preliminary showing that an offense was committed and therefore that a sufficient factual basis exists to support an award of restitution.

"The burden of demonstrating the amount of the loss sustained by a victim as a result of the offense shall be on the attorney for the Government." 18 U.S.C. § 3664(e). The defendant has the burden of demonstrating his financial resources. *Id*. "The burden of demonstrating such other matters as the court deems appropriate shall be upon the party designated by the court as justice requires." *Id*. The Court finds it appropriate to place the burden of showing the commission of an offense, for purposes of determining a proper amount of restitution, on the Government. Disputes "as to the proper amount or type of restitution shall be resolved by the court by the preponderance of the evidence." *Id*.

The Government requests restitution to the alleged victims in the total amount of $16,198,996.39, as follows: (1) $7,470,740.85 to Legacy Bank ("Legacy"), (2) $8,178,255.54 to Enterprise Bank ("Enterprise"), and (3) $550,000 to First Federal Bank ("First Federal"). As to Legacy and Enterprise, the Government alleges that Barber defrauded those banks by providing falsely inflated financial statements in obtaining loans from those banks and by diverting loan funds

-3-

to other projects.  The Government's claims for restitution on behalf of Legacy and Enterprise must

be denied, as the Government has not shown a sufficient factual basis as to the nature and

materiality[2] of any misrepresentations by Barber and has failed to show that any such

misrepresentations directly and proximately caused a loss to either Legacy or Enterprise.  The Court

will order restitution in the apportioned amount of $450,000 to First Federal.

Because Barber did not plead guilty to defrauding Legacy and Enterprise, the Government

must come forward with evidence to show a sufficient factual basis by a preponderance of the

evidence.  The Government argues that the Court should accept the following unobjected-to excerpt

of the pre-sentence investigation report ("PSR"):

> As part of the scheme and artifice to defraud, Barber, in his effort to secure certain
> loans and lines of credit from financial institutions, provided false personal financial
> information and statements that overstated his net worth by: overstating his cash on
> hand, understating his liabilities and overvaluing his ownership interest in the various
> LLCs, corporations and partnership entities he listed on his personal financial
> statements.
>
> Barber also submitted false contingent liability statements to financial institutions,
> thereby falsely depicting his financial condition.  Once loans were obtained, Barber
> used portions of loan proceeds for purposes other than those authorized under the
> terms of the loans.

(Doc. 214, ¶¶ 51-52).  These cited paragraphs do not appear to be based on independent investigation

by the probation officer, but rather, are a verbatim recitation of a portion of the bank fraud

allegations in the third superseding indictment in case 12-50035.  (Doc. 12, ¶¶ 9-11).  Although a

court may be permitted to rely on unobjected-to assertions of a PSR in determining an appropriate

---

[2] Materiality of a falsehood is an essential element of bank fraud under any theory.  *See*
Eighth Circuit Model Jury Instructions 6.18.1344 (citing *United States v. Pizano*, 421 F.3d 707, 722
(8th Cir. 2005) (relying on *Neder v. United States*, 527 U.S. 1 (1999))).  While the financial
institution need not actually rely on a misrepresentation, it must be shown that a falsehood had a
natural tendency to influence or was capable of influencing the financial institution.  *Id*.

-4-

sentence, the Court is not required to rely on general, vague assertions in imposing restitution. It seems reasonable to the Court that in the context of analyzing whether a defendant will be responsible for restitution under the MVRA, the Court should require even unobjected-to assertions in the PSR to bear some indicia of reliability. Furthermore, the Court informed the Government at sentencing that the information contained in the PSR was insufficient to support an award of restitution. The attorneys for the Government were specifically advised that the Court would need more information regarding whether and how Barber's conduct caused any losses suffered by Legacy and Enterprise. Notwithstanding this directive, the Government's brief on restitution cites only to the PSR and the affidavit of FBI forensic accountant Steven Williams in supporting its assertion that Legacy and Enterprise are entitled to restitution. The substance of both the brief and Williams's affidavit as to the Legacy and Enterprise loans is simply a rephrasing of the assertions in the PSR.[3] Williams's affidavit avers that the investigation of the charged offenses revealed, based on statements of an "officer of the Barber Group," that Barber provided falsely inflated financial statements to Legacy and Enterprise and diverted funds from both loans. (Doc. 256-1, ¶¶ 7-8).

The testimony at the restitution hearing did not serve to further elucidate what specific misrepresentations Barber made to either Legacy or Enterprise. At the hearing, Steven Williams testified that no investigation was conducted in order to determine the extent of any inflation of Barber's net worth specifically as to the information presented to Legacy and Enterprise. Rather,

---

[3] The brief and PSR also contain the assertions, again almost identical to language in the indictment (Doc. 12, ¶ 15) that Barber falsified certain contracts for pre-sold units in the Legacy building and represented to Legacy Bank that the contracts and pre-sold units were legitimate when, in fact, they were not. The testimony at the restitution hearing, however, indicated that the contracts were legitimate, but that a majority of buyers backed out some time after the Legacy loan was made. (Doc. 267, p. 24).

the Government relied on a statement by Vera Crider, Barber's one-time chief financial officer, that Barber generally overstated cash and interest in LLC's on personal financial statements provided to banks. The Government had a wealth of financial records at their disposal, but it appears that in the more than two years since the allegations of misrepresentations were made, no cross-referencing was ever conducted to verify what specific misrepresentations Barber may have made to Legacy and/or Enterprise. The bank representatives testified that they still were not aware of what misrepresentations Barber made on his loan applications to the respective entities.

As to non-reporting of liabilities, Williams testified that Barber failed to report personal loans made to Barber by his father-in-law, John E. Chambers. The Government presented a series of promissory notes from Barber's records purportedly evidencing these loans. The problem with this evidence is that, again, there is no information from which the Court can ascertain what, if anything, should have been reported on the personal financial statements Barber presented to Legacy or Enterprise. There was no evidence presented as to what Barber owed Mr. Chambers on the dates stated on his personal financial statements. The Government provided evidence of Mr. Chambers actually transferring money to Barber for only two of the promissory notes (one for $400,000 and one for $500,000), both of which were made in early 2004 and one of which contemplated repayment within 17 days.[4] (Gov. Exh. 5). The financial statement provided to Legacy was dated December of 2004; the statements to Enterprise were dated December of 2005 and July and December of 2006. The Court has seen no evidence of if or when Barber was actually paid by Mr. Chambers on any of

---

[4] These two notes were two of only three notes that were also signed by Mr. Chambers, and two of very few notes that contained complete terms, including terms for installment payments as contemplated by the standard form note. Several notes were also made to Barber's LLC's and not to Barber individually. Some notes appear to be duplicates.

the other promissory notes.  Finally, while Barber's personal records show a total balance owed for April 1, 2006 and May 15, 2007, the records also show that Barber appears to have borrowed an additional $7 million and paid down $3.5 million during that same time period.  There is no indication of when the payments were made or amounts borrowed.  It appears that Barber's debt to Mr. Chambers was in a constant state of flux.  This is insufficient evidence to find that Barber made any material representation as to his liabilities to Mr. Chambers as of the dates of his personal financial statements submitted to Legacy and Enterprise.  The fact that Mr. Chambers told investigators, years later, that Barber still owed him over $6 million corroborates Barber's own records showing a debt of over $6 million in 2007, but does nothing to shed light on any amount owed on the dates of the financial statements provided to the banks.

Because Barber did not plead guilty to defrauding Legacy and Enterprise banks, the Government bears the burden of proving his offense conduct by a preponderance of the evidence in order for the Court to impose restitution.  Although the Court may be able to find, based on the evidence presented, that Barber was not always completely honest in his dealings with banks, the evidence falls far short of allowing the Court to make any specific determinations as to what misrepresentations were made to Legacy or Enterprise or to determine the materiality of any misrepresentations that were made.  For the above reasons, the Court finds that the Government did not show, by a preponderance of the evidence, that Barber made any materially false statements when applying for loans from Legacy and Enterprise.

The Court also finds that the Government did not meet its burden of showing that any general misrepresentation(s) by Barber directly and proximately harmed either Legacy or Enterprise.  For the Court to order restitution, it must first find that the alleged victim banks were "directly and

proximately harmed as a result of" Barber's charged conduct.  18 U.S.C. § 3663A(a)(2).  Barber's misrepresentations must therefore have been a proximate cause of the banks' claimed losses.  In the case of loan fraud, that means that the misrepresentations must have induced the lenders to make the loans such that, without the misrepresentations, there would have been no loans in the first place and thus no subsequent defaults.  *See*, *e.g.*, *United States v. Spencer*, 700 F.3d 317, 323 (8th Cir. 2012) (finding defendant's fraud to be a but-for cause of mortgage broker's losses where mortgages would not have been made without the fraud).[5]

The Government did not include *any* assertions as to causation related to the Legacy and Enterprise loans despite having been specifically advised by the Court that more evidence of causation was needed, particularly in regard to those loans.[6]  The brief simply states that Barber made misrepresentations as charged in the indictment and concludes that Barber should be required to pay restitution to Legacy and Enterprise.  The mere making of a misrepresentation is not enough to obligate the wrongdoer to pay restitution.

The Government presented additional evidence at the hearing.  However, the Government assumed an incorrect causation standard when questioning bank representatives.  The Government

---

[5] The Court notes that this is a different standard than the materiality standard for purposes of determining whether the offense of bank fraud was committed, for which reliance on the falsehood is not required.  In order for restitution to be awarded, any falsehood must have been a direct and proximate cause of a loss to the banks.  In this case, where loss is premised on eventual default of the loan, it must be shown that the loans would not have been made but for the alleged falsehoods or that the falsehoods somehow otherwise caused the default.

[6] In contrast, in regard to the loss to First Federal, the Government argued that "Barber and his con-conspirators are the proximate cause of the loss of $550,000 to First Federal Bank because had the purchase price of the property not been inflated by $550,000, First Federal would not have loaned this additional amount and therefore would not have suffered this amount of loss when the unnamed co-conspirator defaulted on the loan."  (Doc. 256, p. 5).  Notably, the Government did not include any similar assertion in regard to the Legacy and Enterprise loans.

-8-

asked the representatives whether Legacy and Enterprise would have made the loans at issue if the officers had known that Barber intentionally misrepresented his net worth.  (Doc. 267, p. 9).  In other words, the Government did not ask whether the banks would have made the loans assuming no fraud had occurred; instead, the Government asked whether the banks would have made the loans assuming the banks had knowledge of the fraud.  This questioning would only reveal whether the banks' lack of knowledge of the fraud was a proximate cause of the loss—not whether the fraud itself caused a loss.  Predictably, the representatives answered that the banks would not have made the respective loans, primarily because banks would not want to loan money to someone that they cannot trust.  It is unlikely that a bank officer would admit to wanting to make a fraudulent loan or to participate in the fraud itself.  An analysis of proximate cause, however, cannot be premised on whether the victim would have suffered a loss had they simply known of the crime.  Rather, the analysis must be whether the victim would have still suffered a loss if the crime had not occurred at all.

Even if the Government had used the correct causation analysis, the evidence in this case would not support a finding of causation.  Barber presented the banks with one-page financial statements pursuant to his obligations as a personal guarantor on the respective loans.  The Enterprise loan was further securitized by one other personal guarantor, and the Legacy loan by three other personal guarantors.  It is clear that Barber's personal financial statements were not an important, and certainly not a decisive, factor in Legacy and Enterprises decision to loan Barber money.  Rather, based on the evidence, it appears that the banks relied on other factors in making the loans, including the apparent merits of the proposed real-estate deals, the number of pre-sold units on the Legacy building project, Barber's successful past performance, the fact that Barber's

father-in-law owned a successful bank, and the high appraisal value of the collateral in each instance.[7]  Barber's personal financial statements would not have been of primary importance in the banks' determination of whether to loan money to Barber's entities.  Rather, the statements would have been of secondary importance in allowing the banks to be able to determine whether they could adequately backstop their losses in the event the real-estate investment failed and the collateral was insufficient to cover the losses.  Nothing in the loan documents or the testimony credibly indicated that this secondary consideration weighed significantly in the decision to make the loans.

Testimony by Enterprise and Legacy representatives did not fill any evidentiary gaps left by the Government's briefing.  A bank representative for Enterprise did testify that the loans at issue would probably not have been made had the banks been presented with Barber's accurate financial information.  The Enterprise representative later admitted, however, that he did not even know what the representations were—negating the possibility that he had actually conducted a credible analysis. The representative for Legacy testified that he could not say with certainty that the bank would not have made the loan if it had accurate information.  Representatives from both banks admitted they knowingly relied on financial statements that were six or seven months old in making the loans, even

---

[7] This is particularly borne out by the evidence in regard to the Legacy loan, for which the loan memo states "[w]e are familiar with many of the developments that [Barber and Seth Kaffka, Barber's brother-in-law,] have going on . . . and know that they are having tremendous success with them;" "[w]e hope to do some additional deposit business with Brandon and Seth . . . and related companies;" "[t]hey married sisters, and the sister's [sic] dad is John Ed Chambers who has the majority interest in Chambers Bank;" and "[a] huge strength in this credit is that 23 of the 37 condos are 'reserved' with earnest money placed down."  (Gov. Exh 1A).  The memo notes that the loan officer was familiar with the individuals who had reserved condos and comfortable with their ability to honor the contracts, reveals confidence in the deal due to the fact that it was the first project of its kind in Fayetteville, cites the bank's previous success lending money to Lynnkohn, LLC (the entity applying for the loan), and generally states "[w]e really like this deal because of what it is more than anything."  *Id*.

though Barber's constantly changing financial situation should have cast some doubt on the reliability of non-current statements.[8]   The testimony also revealed that no independent investigation was made, on behalf of either Legacy or Enterprise, into the representations made by Barber on his one-page financial statements, which showed a net worth far exceeding the loan amounts.   The statements are detail-poor, listing business entities with only Barber's ownership percentage and a number purporting to state the company's value as an asset to Barber.   The banks did not, however, require more detailed information.   The representatives admitted that the banks conducted no independent due diligence into the veracity of the stated worth of Barber's business entities.   An Enterprise representative testified that, although the bank did some independent verification of net worth of loan applicants in certain circumstances, he did not feel that was necessary in Barber's case. Had the banks believed that Barber's representations were an important factor in making their loan decisions, they would have investigated the nature and quality of Barber's listed assets and whether the listed business entities (accounting for a large majority of the listed assets) themselves had liabilities that would have altered Barber's true net worth.   They did not do so.   Finally, Barber received otherwise favorable terms on the loans, and the Legacy representative testified that Legacy might still have made its initial loan if given accurate information, but may have made the loan on

---

[8] For instance, a cursory look at the financial statements provided by Barber to Enterprise would have revealed that Barber's stated net worth decreased by over six million dollars in the course of six months—from July to December of 2006. (Gov. Exh. 3B).  The loan was made seven months later, in July of 2007, when Barber's net worth was likely to have been materially different. In light of this evidence, the Enterprise representative's testimony that *any* change in Barber's financial position from what was stated on the 2006 financial statement likely would have resulted in the bank not making the loan is not credible.

different terms.[9]  Not knowing what the misrepresentations were, the representative could not say with any certainty what the different terms might have been.

For the above reasons, the Court finds that the Government did not show that any misrepresentation by Barber caused a loss to either Legacy or Enterprise by inducing either bank to make a loan it would not otherwise have made.  Even assuming that the Government had shown a specific misrepresentation made by Barber in securing the Legacy or Enterprise loans, the alleged misrepresentations were unlikely to have been so material as to have derailed the loans had the banks known of the true state of Barber's financial affairs.

As to Barber's diversion of funds from the Legacy and Enterprise loans, "[u]ltimately, the question is not how many dollars were improperly diverted, but what loss the diversion caused." *United States v. Powers*, 2013 WL 5962052 at *5 (D. Neb. Nov. 6, 2013) (finding, in that case, that had the defendant not diverted loan proceeds, there would more than likely have been enough money to pay the outstanding principal).  The Government did not include any argument as to the diversion of funds causing the banks' losses either in its memo or at the hearing.  The only evidence in this case that the diversion of funds caused Barber to default on his loans was the testimony of Steve Williams, on cross-examination, that he thought the diversions could have contributed to the default, though perhaps did not directly cause it.  This is not a sufficient basis to find the requisite causation, especially where the evidence also showed other factors that likely contributed to Barber's ultimate default—including a rapidly declining real estate market, buyers pulling out of contracts for pre-sold units at the Legacy building, and Barber's myriad of other business and legal issues.

---

[9] The Court does not find the Enterprise representative's testimony that any change in Barber's personal financial statement would have resulted in the loan not being made under any terms to be credible for reasons already stated.

-12-

The Government did not otherwise argue or show that any draw from either loan was itself fraudulent. And, even if it had, the Court would have to calculate the loss caused by any individual, fraudulent draw and then credit Barber in proportion with whatever credit would be applicable to the overall loss. *See*, *e.g.*, *United States v. Garcia*, 939 F.Supp.2d 1155 (D. N.M. 2013) (finding insufficient evidence to conclude that diversions were but-for cause of default, but imposing restitution in amount of fraudulent draw downs minus a credit proportionate to credit that would otherwise have been imposed on total amount of loss due to default). The Court was not presented with sufficient evidence to engage in this calculation with any reasonable certainty. The Government introduced flow charts (Gov. Exh. 6) purporting to show transfers of funds from various draws on the Legacy and Enterprise loans. It appears that these charts were prepared by Mr. Williams in order to trace money for purposes of the money laundering charges. For the most part, the charts show transfers of money from one Barber account to another without showing what the money was ultimately used for. Where money stayed in Barber's possession and merely flowed through a construction account or some other LLC, the Court cannot conclusively determine that the money was ultimately improperly diverted. It is not inconceivable, or even unlikely, that Barber may have paid expenses related to the Legacy and/or Enterprise loans through one of his many LLC's. The flow charts may show that Barber had a convoluted business model and messy accounting, but they fall short of showing that either Legacy or Enterprise is entitled to restitution. Barber did not have to prove appropriate use of loan funds; the Government had the burden of showing inappropriate diversion of funds causing a loss to the banks. It failed to do so.

Even if the flow charts were sufficient evidence of diversions, the Government did not provide any analysis or calculation as to any loss amount suffered by either Legacy or Enterprise as

-13-

a result of the diversions. The Court will not attempt to cobble together summary information from six separate flow charts to engage in those calculations on the Government's behalf, only to get an imprecise and unreliable result.

For all the reasons stated above, the Court finds that the Government has failed to show by a preponderance of the evidence that Barber engaged in conduct that directly and proximately caused losses to Legacy or Enterprise. The Court will not, therefore, order Barber to pay restitution to either Legacy or Enterprise.

In the alternative, the Court also declines to order restitution based on a finding that "determining complex issues of fact related to the cause or amount of the victim's losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process." 18 U.S.C. § 3663A(c)(3). Even if the Court were to belabor the issue and receive more evidence or argument, unraveling both the cause of Legacy and Enterprise's losses as well as any amount of their losses would complicate and prolong this (already prolonged) sentencing process to a degree that the need to provide restitution to Legacy and Enterprise is outweighed by the burden on the sentencing process. The loans and deals involved in this case were far from straightforward, and given the complexities of the transactions and this case in general, it would be a long and likely fruitless endeavor for the Court to attempt to piece together any sufficiently firm finding of causation. Determination of the amount of loss would likewise be overly complicated, as it is not clear that the amount of the deficiency judgments secured by the lenders would be an appropriate amount to award in restitution. Suffice it to say that the analysis of a loss for purposes of restitution is not necessarily the same as the

analysis of what amount should be awarded in a deficiency judgment.[10]  The Court notes that the need for restitution may be slightly lessened in this case, where Legacy and Enterprise have other avenues by which to recover their losses.  Barber is otherwise indebted to Legacy and Enterprise as evidenced by civil judgments against him, and his debts were not discharged in bankruptcy.  Any monies recovered by the banks as a result of those civil judgments would, in any event, offset any amounts the Court might order be paid in restitution.  18 U.S.C. § 3664(j)(2).  An even more prolonged analysis of restitution as to Legacy and Enterprise in this case would therefore likely be an inefficient exercise in redundancy.

As to the asserted loss of $550,000 to First Federal Bank ("First Federal"), the Court has already found, in the case of Barber's co-defendant Jeff Whorton, that First Federal suffered a loss of $550,000 as a result of the bank fraud conspiracy charged in 13-50004.  Furthermore, Barber pleaded guilty to this offense, and has agreed that First Federal is entitled to $550,000 in restitution.  The record in this case supports that finding and that concession by Barber.  The Court found it appropriate to allocate payment of this loss between Whorton and Barber pursuant to 18 U.S.C. § 3664(h).  Whorton was ordered to pay $100,000.  Barber will therefore be ordered to pay $450,000

---

[10] For example, a restitution amount must be reduced by the "amount of money the victim received in selling the collateral, not the value of the collateral when the victim received it." *Robers v. United States*, 134 S. Ct. 1854, 1856 (2014) (rejecting Ninth Circuit's conclusion in *United States v. Yeung*, 672 F.3d 594, 604 (2012), that a restitution obligation should be reduced by the value of collateral at the lender took title via a credit bid at a foreclosure sale).  Legacy bought the Legacy building property in a foreclosure sale for less than the amount still owed on the loan, resulting in the deficiency judgment.  The property was then given to other participating banks, while Legacy kept the deficiency judgment.  The Court does not know the amount the participating banks may have received by selling the collateral, nor how Legacy's decision to attempt to recover on the deficiency judgment instead of through sale of the collateral might affect the loss or causation analysis (or whether the participating banks could properly waive or assign their right to restitution).

in restitution to First Federal.  The Court finds that this allocation reflects the defendants' respective levels of contribution to First Federal's losses.  Barber was the driving force behind the negotiations related to this loan.  Barber and Gary Combs, a deceased unindicted co-conspirator, actively misrepresented the purchase price of the lots bought from Whorton by Combs, while it appears that Whorton acquiesced in the scheme.

Restitution to First Federal will be due[11] and payable immediately.  If Barber is unable to pay the full amount immediately, the balance is to be paid in quarterly installments at a rate of at least ten percent of the funds available to him during incarceration.  After incarceration, payment of any unpaid financial penalty will become a special condition of supervised release with the remaining balance to be paid in monthly installments of ten percent of Barber's net monthly household income.

Although the Government originally identified numerous other victims in objecting to the loss amount included in the PSR (Doc. 204), the Government has not requested or presented evidence as to restitution owed to any other alleged victims, and no other restitution will therefore be awarded.

An amended judgment will be entered ordering $450,000 in restitution to First Federal Bank.

IT IS SO ORDERED this 21st day of January, 2015.

/s/ P. K. Holmes, III
P.K. HOLMES, III
CHIEF U.S. DISTRICT JUDGE

---

[11] Barber and his counsel were directed to specifically address Barber's financial condition in their brief.  They did not do so.  The Court nonetheless believes that it can fashion an appropriate schedule of payments based on the record in this case.

-16-